1    **MAYER BROWN LLP**
     Dale J. Giali (SBN 150382)
2    dgiali@mayerbrown.com
     Andrew Z. Edelstein (SBN 218023)
3    aedelstein@mayerbrown.com
     350 South Grand Avenue, 25th Floor
4    Los Angeles, CA  90071-1503
     Telephone:  (213) 229-9500
5    Facsimile:   (213) 625-0248

6    **MAYER BROWN LLP**
     Carmine R. Zarlenga (*pro hac vice*)
7    czarlenga@mayerbrown.com
     1999 K Street, N.W.
8    Washington, D.C. 20006-1101
     Telephone:  (202) 263-3000
9    Facsimile:   (202) 263-3300

10   Attorneys for Defendants
     CALIFORNIA PIZZA KITCHEN, INC
11   and NESTLE USA, INC.

12                  **UNITED STATES DISTRICT COURT**

13               **SOUTHERN DISTRICT OF CALIFORNIA**

14

15   KATIE SIMPSON, on behalf of herself        Case No. 13-CV-0164 JLS JMA
     and all others similarly situated,
16                                              Action Filed: January 21, 2013
                         Plaintiffs,
17                                              **DECLARATION OF DALE J.
                                                GIALI IN SUPPORT OF
18          v.                                  DEFENDANTS' MOTION FOR
                                                SANCTIONS UNDER FED. R.
19   CALIFORNIA PIZZA KITCHEN, INC.             CIV. P. 11**
     and NESTLE USA, INC.,
20
                         Defendants.
21                                              Hearing Date:    July 11, 2013
                                                Hearing Time:    1:30 p.m.
22                                              Location:        Ctrm 4A

23                                              Trial Date: None Set

24

25

26

27

28

_____

705668644.2

1    I, Dale J. Giali, declare:

2    1.    I am a partner with the law firm of Mayer Brown LLP, counsel of

3    record for defendants Nestlé USA, Inc. ("Nestlé") and California Pizza Kitchen,

4    Inc. ("CPK") in the above-captioned matter.  I am admitted to practice before this

5    Court.  I have personal knowledge of the facts asserted in this declaration.  I submit

6    this declaration in support of defendants' motion for sanctions.

7    2.    Plaintiff's counsel in this action is Gregory Weston of The Weston

8    Firm.  Mr. Weston previously sued Nestlé in the case styled *Bahn v. Nestlé USA,*

9    *Inc.*, No. 2:10cv1022 (C.D. Cal.).  In that case, Mr. Weston filed a lawsuit

10   challenging trans fat disclosure statements on the labels of Hot Pockets products.

11   It was Nestlé's position in the *Bahn* litigation that because the challenged Hot

12   Pockets products contained meat or poultry, they were regulated by the U.S.

13   Department of Agriculture ("USDA") under the Federal Meat Inspection Act

14   ("FMIA") and/or the Poultry Products Inspection Act ("PPIA").  Nestlé further

15   asserted in *Bahn* that such products, including their packaging, were subject to pre-

16   market clearance by the USDA and had been cleared by the agency, and, therefore,

17   Mr. Weston's state-law claims attempting to impose non-identical packaging,

18   product or labeling requirements (e.g., seeking to prohibit approved labeling

19   statements about trans fat) were preempted and barred.  I specifically engaged in a

20   meet and confer session with Mr. Weston on this very topic on March 16, 2010.

21   On April 14, 2010, Nestlé filed a motion to dismiss the complaint in *Bahn* based,

22   in part, on this USDA pre-market clearance express preemption.  No. 2:10cv1022

23   (C.D. Cal.), Dkt. #10.  In lieu of opposing the motion, Mr. Weston filed an

24   amended complaint on June 18, 2010.  Mr. Weston's amended complaint retained

25   the alleged claims against Hot Pockets products that were subject to USDA pre-

26   market clearance procedures.  No. 2:10cv1022 (C.D. Cal.), Dkt. #26.  On July 12,

27   2010, Nestlé filed a motion to dismiss the amended complaint and again argued

28   express federal preemption based on USDA pre-market clearance of the products

1 | and labels that were being challenged.  While the motion to dismiss the amended
2 | complaint was pending, The Weston Firm dismissed the *Bahn* case.

3 |     3.     On Tuesday, December 11, 2012, I received a letter dated December
4 | 5, 2012 from Mr. Weston.  The letter enclosed a draft purported nationwide
5 | consumer class action complaint.  The letter was a prelitigation demand to Nestlé
6 | relating to claims that Nestlé's frozen pizza products contain artificial trans fatty
7 | acids ("TFAs").  In the letter, Mr. Weston demanded that Nestlé "reimburse all
8 | U.S. purchasers of" 27 of Nestlé's frozen pizza products.  Unless Nestlé acted
9 | promptly, Mr. Weston stated, he would file the complaint.  And, "[g]iven the
10 | gravity of the harm" caused by the pizzas, Mr. Weston stated he would have to file
11 | a complaint within the month absent a tolling agreement.  True and correct copies
12 | of the prelitigation demand letter and its attached draft complaint, both sent to me
13 | by Mr. Weston, are attached hereto as Exhibit A.

14 |     4.     By e-mail correspondence on December 14, 2012, Jack Fitzgerald, an
15 | attorney who works at The Weston Firm, confirmed to me that Nestlé had until
16 | January 11, 2013 to respond to the December 5, 2012 prelitigation demand letter.

17 |     5.     By e-mail correspondence on January 7, 2013, Mr. Fitzgerald
18 | confirmed an extension of Nestlé's time to respond to January 18, 2013.  In his e-
19 | mail, Mr. Fitzgerald enclosed a letter to me dated January 7, 2013.  The letter was
20 | a written settlement demand.  Together with the December 5 letter, this was the
21 | second settlement demand I had received from The Weston Firm regarding the
22 | frozen pizza products in less than a month.  Among the terms of the January 7,
23 | 2013 settlement demand was a fee request (to be paid to The Weston Firm) of up
24 | to $675,000.  True and correct copies of Mr. Fitzgerald's January 7, 2013 e-mail
25 | and enclosed settlement letter, both sent to me by Mr. Fitzgerald, are attached
26 | hereto as Exhibit B.

27 |     6.     On January 18, 2013, I responded to the December 5, 2012 and
28 | January 7, 2013 prelitigation demand letters on behalf of Nestlé.  The response was

a 10-page, single-spaced letter, attaching 2 product labels.  The response detailed numerous arguments against Mr. Weston's legal theory, with citation to legal authority.  One argument detailed in Nestlé's response was the same USDA pre-market clearance preemption argument that was raised with Mr. Weston several times in the *Bahn* action in 2010, in which he dismissed his action in lieu of opposing Nestlé's motion to dismiss.  *See supra* ¶ 2.

7.     I attached two product labels to Nestlé's January 18, 2013 response so that Mr. Weston could actually see the USDA clearance stamp right on the front of the package.  A true and correct copy of my January 18, 2013 response letter, with attached images of two product labels, is attached hereto as Exhibit C.

8.     Mr. Weston filed his initial complaint against Nestlé and CPK on January 21, 2013, three days after receiving Nestlé's response.

9.     On January 30, 2012, Mr. Weston appeared on ABC TV's nationally-broadcasted morning show Good Morning America in relation to a segment Good Morning America ran on Mr. Weston's lawsuit against Nestlé and CPK.  The broadcast was available for viewing on ABC's website that same morning.  As of the date of this declaration, that entire segment, including the interview of Mr. Weston, can be seen at the following website:  http://abcnews.go.com/US/nestle-facing-million-lawsuit-trans-fat-frozen-pizzas/story?id=18354382 .  A transcript of much of the broadcast is available on the ABC website, and a true and correct copy of that transcript, as printed out from the website, is attached hereto as Exhibit D.

10.    I have viewed the January 30, 2013 Good Morning America broadcast many times, including numerous times on January 30, 2013.  The segment repeated several of Mr. Weston's assertions appearing in his initial (and now his amended) complaint, including that defendants' pizza contained poison.  Among the specific statements that Mr. Weston made on the nationally-televised segment were "[Pizza] shouldn't have a toxic food additive that's been banned in many parts of the world" and "We're seeking all of the money Nestlé's ever made selling frozen

-3-

1    pizza."

2        11.    Shortly after 2 p.m. on January 30, 2013, I spoke by phone with Mr.

3    Fitzgerald.  I told Mr. Fitzgerald that I had seen the Good Morning America

4    segment and that the segment repeated many improper statements, such as

5    equating the pizza with "toxic food additives," "poison," "banned" ingredients,

6    "causing cancer," etc.  I told him that he is well aware – by virtue of Nestlé's

7    detailed January 18 response letter and otherwise – that Nestlé believes these

8    allegations are improper and baseless.  I told him that filing a lawsuit on these

9    baseless, improper and overstated allegations is one thing – and Nestlé is prepared

10   to prevail in court – but publicizing them in the media is irresponsible,

11   inappropriate and unfair to Nestlé, and could cause commercial damage.  I

12   specifically stated to Mr. Fitzgerald that the statements Mr. Weston made on the

13   broadcast that (i) the pizza contains toxic substances, and (ii) contains ingredients

14   that are banned in many parts of the world, were both false and irresponsible.  I

15   told Mr. Fitzgerald that I was calling to ask him to stop making such statements to

16   the media.

17       12.    Mr. Fitzgerald told me that the media statements were Mr. Weston's

18   responsibility, but that he would pass on my request to Mr. Weston.

19       13.    On February 1, 2013, Mr. Weston called me back to follow up on my

20   January 30, 2013 request to Mr. Fitzgerald.  I confirmed my request to Mr. Weston

21   that he stop disparaging defendants in the media.  Mr. Weston informed me that he

22   was declining my invitation to stop talking to the media.  He said he had every

23   intention of using the media, would continue to do so and even had plans to

24   increase media use.  Mr. Weston made clear to me that he would stop talking to the

25   media if defendants settled the case, and that I would be surprised how little he

26   would accept to settle.

27       14.    On February 5, 2013, KFMB Channel 8, San Diego's local CBS

28   affiliate, broadcast a story about this case on its 11 p.m. news.  I have viewed the

-4-

1    segment numerous times.  As of the date of this declaration, the broadcast was

2    available for viewing at the following website:

3    http://www.cbs8.com/category/155799/video-landing-

4    page?clipId=8329875&autostart=true .  At my direction, someone from my firm

5    transcribed the broadcast.  A true and correct copy of that transcript is attached

6    hereto as Exhibit E.

7         15.    At the conclusion of the February 5 KFMB Channel 8 segment, the

8    reporter indicates that the station's website provides more information on the

9    lawsuit and on which frozen pizza brands contain trans fats.  On February 6, 2013,

10   I followed the reporter's instructions and found a link on their website to

11   http://www.poisonpizza.com .  Subsequent communications with KFMB revealed

12   that a link to the poisonpizza.com site was placed on KFMB's website at the behest

13   of Mr. Weston (I understand the link has since been removed).

14        16.    On February 6, 2013, I visited http://www.poisonpizza.com .  At my

15   direction and on that day, personnel at my firm printed out the contents of this

16   website.  A true and correct copy of these website printouts, as of February 6,

17   2013, is attached hereto as Exhibit F.

18        17.    At my direction, my firm began to investigate the website and its

19   registration.  We were able to conclude that the domain name

20   www.poisonpizza.com was registered on the website GoDaddy.com on December

21   4, 2012.

22        18.    As of February 6, 2013, the poisonpizza.com website did not, itself,

23   disclose who was responsible for its contents (the website provided no such

24   identifying information).  Nonetheless, there was overwhelming evidence that the

25   website was affiliated with The Weston Firm.  For example, the website could be

26   seen in the 47th second of the Good Morning America segment in which Mr.

27   Weston was interviewed.  Moreover, the website was linked to KFMB's website as

28   part of that station's interview of Mr. Weston.  Finally, I reviewed the site and

1    noted that it had a page devoted to news video clips about this lawsuit at

2    http://www.poisonpizza.com/videos.html .  The "Videos" page contains four

3    embedded video clips associated with The Weston Firm.

4         19.    On March 14, 2013, defendants served Mr. Weston and The Weston

5    Firm with a motion for sanctions under Fed. R. Civ. P. 11.  A true and correct copy

6    of defendants' initial Rule 11 motion points and authorities is attached as Exhibit J.

7    In that motion, defendants pointed out that the poisonpizza.com website was in

8    violation of California Rules of Professional Conduct, including that the website

9    did not identify who was responsible for it.  *Id.*, n.5.  On March 26, 2013 – and in

10   lieu of responding to defendants' motion to dismiss or its Rule 11 motion – Mr.

11   Weston filed an amended complaint.  The amended complaint makes certain

12   changes from the initial complaint.  Attached as Exhibit K is a redline comparison

13   of the changes between the initial and amended complaints, as prepared by my law

14   firm.  In addition to the changes to the complaint, Mr. Weston also made changes

15   to the poisonpizza.com website after receiving defendants' initial Rule 11 motion,

16   including for the first time identifying the website as being associated with his

17   firm.  Attached as Exhibit L, are copies of printouts of the various screens of the

18   website as of April 3, 2013, which were saved by personnel at my firm.

19        20.    On February 11, 2013, The Weston Firm asked defendants to

20   immediately conduct the Rule 26(f) meeting of counsel.  A true and correct copy of

21   my e-mail correspondence with The Weston Firm is attached as Exhibit G.  During

22   those communications, I pointed out to Mr. Weston that because there was no

23   initial Case Management Conference on calendar in the action, and because

24   defendants intended to move to dismiss the complaint, and because there was no

25   basis to commence disclosures or discovery on this record (as many courts have

26   ruled in other consumer class actions under like circumstances), defendants did not

27   believe it appropriate or necessary to conduct the Rule 26(f) meeting and that we

28   believed it more appropriate to await the calendaring of the initial Case

-6-

1   Management Conference before doing so.  In response, Mr. Weston gave notice of

2   and then filed an ex parte application to have the Court specially order the parties

3   to immediately engage in a Rule 26(f) early meeting of counsel.  The application

4   was summarily stricken by the Court as "[f]ailing to comply with Judge Adler's

5   Chamber Rules re: case management and discovery disputes."  *See* Dkt. #9 in this

6   action.  Mr. Weston then proceded with a motion to compel a Rule 26(f)

7   conference (*see* Dkt. #18), which also was denied (Dkt. #19).

8        21.   A true and correct copy of the complaint in *Caldera v. J.M. Smucker*

9   *Company*, Case No. 37-2013-00036245-CL-DF-CTL, as obtained at my direction

10  from the San Diego Superior Court Register of Actions website, is attached hereto

11  as Exhibit H.

12       22.   A true and correct copy of the complaint in *J. M. Smucker Co. v. The*

13  *Weston Firm*, Case No. 5:13-CV-00448-JRA, pending in the United States District

14  Court for the Northern District of Ohio and downloaded from PACER at my

15  direction, is attached hereto as Exhibit I.

16       23.   Based on a review of my firm's billing entries in this action, I have

17  determined that defendants' have incurred no less than $200,000 in attorneys' fees

18  for the defense of this action, <u>not</u> including the fees incurred in bringing the instant

19  Rule 11 motion.

20       24.   Based on a review of billing entries, I have determined that

21  defendants' have incurred no less than an additional $75,000 in attorneys' fees in

22  preparing the instant Rule 11 motion (which includes overlapping work undertaken

23  with respect to defendants' initial Rule 11 motion).

24       25.   Attached as Exhibit M is a true and correct copy of Exhibit 25 of the

25  request for judicial notice filed in support of defendants' renewed motion to

26  dismiss and is a copy of the packaging for Stouffer's® French Bread Pizza

27  Sausage (12 oz box) in use during the class period.

28

1       I declare under penalty of perjury under the laws of the United States that

2   the foregoing is true and correct.  This declaration is executed on May 6, 2013 at

3   Los Angeles, California.

4

5                                  /s/ Dale J. Giali
                                      Dale J. Giali

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DALE GIALI RE MOTION FOR SANCTIONS,
CASE NO. 13-CV-0164